UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 CR 926 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| CHARLES T. THOMAS, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Charles T. Thomas ("Defendant") was charged in a one-count indictment with theft of government funds in violation of 18 U.S.C. § 641. Presently before the Court is Defendant's motion to suppress statements he made to federal law enforcement officers during an interview at his home. (R. 43, Def.'s Mot.) The Court conducted an evidentiary hearing over three days. (R. 48, Min. Entry.) Defendant and his wife, Sherry Thomas, testified, along with Special Agent Mayra Colin of the United States Department of Housing and Urban Development ("HUD") and Special Agent Lee Dahlgren of the United States Department of Labor ("DOL"), the two law enforcement officers who interviewed Defendant. In addition, the Court heard testimony from several current and former employees of the Chicago Housing Authority ("CHA"): Cherie Strong, Assistant General Counsel in the Real Estate Division; Ellaye Accoh, an auditor in the Office of the Inspector General; and Donald Anderson, former Inspector General. Roxanne Volkmann, a HUD Contract and Industrial Relations Specialist, and Dr. Carl Johnson, Defendant's treating physician, also provided testimony. Pursuant to Federal Rule of Criminal Procedure 12(d), the Court now states its findings of fact and conclusions of law. For the reasons set forth below, Defendant's motion is denied.

## RELEVANT FACTS[1]

### I. CHA Investigation

The CHA receives federal funding as a grantee of HUD. The CHA is responsible for maintaining all records pertaining to its use of federal funds. The CHA contracts with companies to perform its renovations of CHA properties. Defendant owns and operates Thomas Painting and Decorating. It is not clear whether Thomas Painting and Decorating contracted directly with CHA to perform renovation work or was employed through a subcontractor. Regardless, as a recipient of federal funds, Defendant was required to pay his employees according to a prevailing wage rate set by the Secretary of Labor and enforced by HUD. 42 U.S.C. § 5310. The Secretary of Labor determines the prevailing wage pursuant to the Davis-Bacon Act, 40 U.S.C. § 3141 *et seq.* Sometime in 2009 or 2010, the CHA Procurement Department received complaints from Thomas Painting and Decorating employees that Defendant failed to pay employees according to the prevailing wage rate and complaints that Defendant failed to pay employees at all. The CHA also received complaints from employees of property management companies associated with the CHA claiming that Defendant engaged in bid-rigging and failed to comply with the terms of contracts between Thomas Painting and Decorating and the CHA.

The CHA conducted an investigation into the complaints and performed an audit of Thomas Painting and Decorating. On or around January 7, 2010, Sam Adam, Jr. notified the CHA that he was representing Defendant concerning any investigation involving him or his

---

[1] These facts are drawn from the testimony provided by Defendant, Sherry Thomas, Special Agents Colin and Dahlgren, CHA employees Anderson, Accoh and Strong, HUD employee Volkmann, and Dr. Johnson at the evidentiary hearing conducted on September 9, 2013, (R. 55); November 25, 2013, (R. 64); and December 9, 2013, (R. 65). Additional facts have been taken from the indictment, (R. 1); and undisputed facts provided in Defendant's amended motion to suppress, (R. 43), and the Government's response to the amended motion, (R. 44).

business. Adam provided Cherie Strong, the CHA attorney assigned to manage the investigation, with various materials the CHA had requested from Defendant, including payroll information and check stubs. Strong turned the materials over to Donald Anderson, former Inspector General of the CHA, and communicated with him regularly regarding the investigation. Anderson interviewed around 30 complainants who were former and current employees of Thomas Painting and Decorating. After the audit and interviews were completed, Anderson wrote his final report and concluded the investigation.

## II. HUD Investigation

Roxanne Volkmann, Contract and Industrial Specialist at HUD, was tasked with ensuring that HUD grantees, including the CHA, complied with the prevailing wage requirements of the Davis-Beacon Act. Sometime in 2010, she received complaints by two of Defendant's employees that they were being underpaid for work on CHA projects sponsored by HUD. Volkmann contacted the CHA regarding this matter because as the grantee, the CHA was responsible for maintaining all documentation on its HUD-subsidized projects. Volkmann requested that the CHA send to HUD any paperwork and copies of payroll information pertaining to Thomas Painting and Decorating. Anderson turned over all records, files, tapes and other materials he had accumulated in his investigation to Brad Geary, an Assistant Special Agent in charge of HUD's Office of the Inspector General. Anderson, along with his senior auditor, Ellaye Accoh, met with Geary to brief him on the CHA's investigation. Special Agent Mayra Colin also worked in HUD's Office of the Inspector General and investigated allegations of fraud and abuse in HUD-related programs. In November 2010, Special Agent Colin began her investigation of Defendant by conducting a background check on Defendant. She was

assisted in her investigation by Special Agent Lee Dahlgren of the DOL. Colin and Dahlgren interviewed Defendant on June 5, 2012, at his home in South Holland, Illinois.[2]

### III. Defendant's Surgery

Eleven days before Defendant's interview, on May 25, 2012, Defendant underwent surgery to repair two hernias and remove a moderate-sized mass from his chest. Dr. Carl Johnson performed the nearly two-hour surgery, which involved placing Defendant under anesthesia, and he sent Defendant home after the surgery was complete. Dr. Johnson prescribed Defendant 30 five-milligram tablets of Norco, a pain relief medication milder than Vicodin but stronger than Tylenol with codeine, and instructed him to take one or two tablets every four hours. Side effects from the medication include drowsiness, constipation, dizziness, and fatigue. Potential complications from chest surgery include bleeding and infection, which usually causes redness in the chest area, fever, chills, and drainage. Potential complications from hernia surgery include difficulty urinating and passing bowels, dehydration, listlessness, fatigue, and recurrence of the hernia. Patients are therefore restricted from lifting anything heavier than 10 to 15 pounds or otherwise straining or pushing. Dehydration can affect a patient's ability to think and to communicate.

### IV. Defendant's Interview with Special Agents Colin and Dahlgren

The morning of June 5, 2012, Special Agents Colin and Dahlgren arrived at Defendant's home. Defendant's wife, Mrs. Thomas, answered the door, and the agents showed their badges and identified themselves. The agents told Mrs. Thomas they wanted to speak to Defendant

---

[2] In his amended motion to suppress, (R. 43), Defendant states that the interview took place on June 5, 2012. During the suppression hearing, however, Defendant repeatedly interrogated witnesses regarding the actual date of the interview. Having received no credible evidence to the contrary, the Court will proceed under the assumption that the interview occurred on June 5, 2012, for the purpose of resolving this motion.

4

about Thomas Painting and Decorating. Mrs. Thomas told the agents that her husband was recovering from surgery and would not be able to speak with them. The agents told her that they would only take a few minutes of his time, and Mrs. Thomas permitted the agents enter her home. Mrs. Thomas then went to Defendant's bedroom on the second floor of the home to awake him. Defendant testified that he felt lightheaded and woozy from taking pain medication shortly before the visitors arrived. Although testimony differs as to precisely how long it took Defendant to make his way downstairs to meet with the agents, it took him at least five minutes to dress and go downstairs. Defendant and the agents sat in Defendant's living room. Both agents wore business suits to the interview, and each carried a firearm and a baton that were concealed from plain view. The Government and Defendant present markedly different versions of what transpired next.

Special Agents Colin and Dahlgren testified that they identified themselves and presented Defendant with their credentials. The agents testified that Special Agent Colin conducted most of the interview, and Special Agent Dahlgren took notes. The interview lasted about an hour and a half. The agents testified that they never threatened Defendant or told him that he was required to answer their questions, and they testified that they used a friendly tone of voice throughout the interview. The agents testified that Defendant told them that he had recently undergone surgery for a tumor and two hernias and was taking pain medication, but that he felt well enough to speak with them. Both agents testified that Defendant seemed normal and did not convey any indication that he was in pain or experiencing discomfort. They further testified that Defendant displayed no signs that he had trouble comprehending Special Agent Colin's questions or understanding the purpose of the interview. Both agents also testified, however, that Defendant provided conflicting statements as to the amount of money he owed the Internal Revenue Service

5

and had trouble remembering the names of his employees. Special Agent Colin testified that Defendant rambled off-topic, discussing his background and personal history, and that she had to refocus him on the issues pertaining to the investigation.

Special Agent Colin testified that prior to meeting with Defendant, she was aware that Sam Adam, Jr. was Defendant's attorney because she had reviewed correspondence between Adam and the CHA. The agents testified that Defendant mentioned his attorney early on during the interview, stating "that he had an attorney, but he was not represented by the attorney at that time." The agents further testified that Defendant stated that he would speak with the agents without his attorney present because he had nothing to hide. Agent Colin testified that at some point during the interview, Defendant admitted to paying employees below the prevailing wage and inflating the number of hours employees worked on certified payroll records submitted to the CHA. After these admissions, in response to an attempt by Agent Dahlgren to clarify some of Defendant's statement, Defendant requested to speak with his attorney, Sam Adam, Jr. The agents testified that they attempted to terminate the interview, but Defendant continued to explain some of his admissions and wanted to show the agents records he had upstairs. The agents testified that they told Defendant that they could no longer speak with him without an attorney and terminated the interview. Special Agent Dahlgren wrote a report memorializing the interview the next day, and, after Special Agent Colin reviewed it for accuracy, he submitted it to his superiors.

Defendant's testimony disputes several aspects of the agents' testimony. Defendant testified that he does not recall the interview with any clarity; rather, the entire morning was a blur. He testified to remembering, however, that the agents failed to identify themselves or to show him their badges prior to the interview. He also testified that he was tired, fatigued, and

6

experiencing pain, and that he told the agents he was not feeling well. Defendant testified that he presumed the agents were employees of the CHA. He testified that Special Agent Dahlgren did most of the talking. Defendant testified that during the interview, Special Agent Dahlgren inaccurately repeated Defendant's statements back to him. When Defendant corrected him, Special Agent Dahlgren became aggravated and upset by Defendant's unwillingness to re-affirm the agent's characterization of Defendant's statements. Defendant testified that the statements Special Agent Dahlgren's report attributed to him were incorrect; Defendant also testified, however, that he did not remember much of what he said to the agents during the interview.

## V.     Defendant's Subsequent Health Problems

Defendant testified that immediately after the interview, his chest wound began to drain a red and yellowish liquid, which he thought indicated an infection. Defendant testified that either he or his wife called either Ingalls Hospital, where Defendant's surgery was performed, or Dr. Johnson, and that either he or his wife were told that drainage was common, and Defendant should not return to see his doctor until his follow-up appointment on June 7, 2012. In a signed declaration made prior to the hearing, however, Defendant attested that after the agents left, his chest wound ruptured and he was rushed to the hospital. In addition, in his declaration Defendant attested that prior to the interview he took Vicodin and Hydrocodeine that he found, but he testified to taking only the milder Norco tablets that Dr. Johnson prescribed him. When questioned about these contradictions, Defendant testified that he simply failed to read the declaration carefully to ensure its accuracy. Defendant testified that he did not address his wound drainage with Dr. Johnson at his appointment. Dr. Johnson observed that Defendant was healing well at Defendant's follow-up appointment on June 7, 2012.

## PROCEDURAL HISTORY

On November 29, 2012, Defendant was charged in a one-count indictment with theft of government funds in violation of 18 U.S.C. § 641. (R. 1, Indictment.) At Defendant's arraignment on December 12, 2012, he appeared and entered a plea of not guilty. (R. 11, Min. Entry.) On May 15, 2013, Defendant filed the instant amended motion to suppress. (R. 43, Def.'s Am. Mot.) The Government responded to Defendant's amended motion on May 23, 2013. (R. 44, Gov't's Resp.) Defendant replied on June 7, 2013. (R. 45, Def.'s Reply.) The Court conducted an evidentiary hearing on September 9, 2013, (R. 55), November 25, 2013, (R. 64), and December 9, 2013, (R. 65). Defendant filed a post-suppression hearing brief on February 4, 2014. (R. 75, Def.'s Post-Hearing Br.) The Government responded on February 25, 2014. (R. 80-1, Gov't's Post-Hearing Br.)

## LEGAL STANDARD

In a motion to suppress a statement, the burden is on the defendant to "make specific factual allegations of illegality, to produce evidence and persuade the court that the evidence should be suppressed." *United States v. Madison*, 689 F.2d 1300, 1308 (7th Cir. 1982) (quoting *United States v. Evans*, 572 F.2d 455, 486 (5th Cir. 1978)). Only once the defendant establishes a basis for his motion does the burden shift to the government to prove by a preponderance of the evidence that the statement is admissible. *Id.* (citing *United States v. Williams*, 604 F.2d 1102, 1125 (8th Cir. 1979)). The voluntariness of a defendant's statement is "a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

## ANALYSIS

Defendant argues that his statement to the agents should be suppressed because it was obtained in violation of his Fifth and Sixth Amendment rights,[3] (R. 75, Def.'s Post-Hearing Br. at 1), as well as in contravention of the requirements of Rule 4.2 of the Illinois Rules of Professional Conduct, (*id.* at 10).[4]

### I. Whether the use of Defendant's statement would constitute a violation of his Sixth Amendment right to counsel

Defendant argues that his Sixth Amendment right to counsel was violated by the absence of his attorney during his interview with the agents. (R. 45, Def.'s Reply at 3.) The Government contends that Defendant had no Sixth Amendment right prior to the filing of criminal charges against him in November 2012. (R. 44, Gov't's Resp. at 10-11.) Defendant argues that at the time of the interview, he had been represented by his attorney, Sam Adam, Jr. for over two years in the related CHA matter, and thus he had a right to have counsel present at the interview. (R. 45, Def.'s Reply at 3.)

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The amendment recognizes "the obvious truth that the average defendant does not have the

---

[3] Defendant also argues that his statement was obtained in violation of his Fourteenth Amendment rights. (R. 75, Def.'s Post-Hearing Br. at 1.) Defendant, however, has neither identified a State actor nor made a claim under the Equal Protection Clause of the Fourteenth Amendment. Accordingly, the Court finds that the Fourteenth Amendment is inapplicable to this motion and proceeds to analyze Defendant's Fifth and Sixth Amendment and State law claims.

[4] In Defendant's amended motion to suppress, he argues that any use of his statement would also violate Sections II and VI of Article I of the Illinois Constitution. (R. 43, Def.'s Am. Mot. ¶ 12.) Defendant never mentions these claims in any of his subsequent briefs. Defendant does not complain of an unreasonable search or seizure of his body or property or of the lack of probable cause for or defects in a warrant, nor does he make any due process or equal protection claims. Therefore, Defendant's Illinois constitutional claims are inapplicable to this motion, and the Court finds that Defendant has abandoned these arguments.

9

professional legal skill to protect himself." *Maine v. Moulton*, 474 U.S. 159, 169 (1985) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462-63 (1938)). It is well-established, however, that this right "attaches at 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Thompkins v. Pfister*, 698 F.3d 976, 984 (7th Cir. 2012) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)). "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 213 (2008)). Prior to this initial appearance, no Sixth Amendment right attaches. *See Thompkins*, 698 F.3d at 984.

In the instant case, Defendant's interview took place in June 2012, more than five months prior to the filing of the indictment and the commencement of any criminal judicial proceedings. Whether Defendant was represented in the CHA matter is immaterial because no criminal judicial proceedings had commenced. Therefore, Defendant had no Sixth Amendment right to counsel when the agents interviewed him. Accordingly, the Court concludes that Defendant's Sixth Amendment rights were not violated by the absence of his attorney at the interview.

## II. Whether use of Defendant's statement would constitute a violation of Defendant's Fifth Amendment right against self-incrimination[5]

---

[5] In Defendant's amended motion to suppress, he argues that agents should have either presented him with a waiver of rights form or admonished him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). (R. 43, Def.'s Mot. ¶ 4.) In his brief, however, Defendant concedes that the agents were not required to admonish him of his *Miranda* rights because he was not in custody. (R. 45, Def.'s Reply at 3); *see United States v. Pelletier*, 700 F.3d 1109, 1114 (7th Cir. 2012) (Law enforcement officers not required to give *Miranda* warnings during non-custodial interview). The Court agrees with Defendant's assessment that the HUD agents were not required to inform Defendant of his *Miranda* rights.

Defendant argues that the use of his statement at trial would violate his Fifth Amendment right against self-incrimination because he was impaired by his pain medication and therefore lacked the capacity to make a voluntary confession. (R. 45, Def.'s Reply at 1-3.) He also argues that his statement was the result of coercion by the agents. (R. 75, Def.'s Post-Hearing Br. at 14-15.)

When examining whether a confession is voluntary, courts ask whether it was the "product of a rational intellect and free will or whether it was obtained by the authorities through coercive means." *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997) (internal citations omitted) (citing *Mincey v. Arizona*, 437 U.S. 385, 398 (1978); *Colorado v. Connelly*, 479 U.S. 157, 165 (1986)). Accordingly, coercive police activity is an "essential predicate" to a determination that a confession was not voluntarily made. *United States v. Carson*, 582 F.3d 827, 833 (7th Cir. 2009). "The issue of coercion is determined from the perspective of a reasonable person in the position of the suspect." *United States v. Fazio*, 914 F.2d 950, 955 (7th Cir. 1990) (citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). Factors relevant to determining whether police conduct is coercive include: "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention, the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Carson*, 582 F.3d at 833 (quoting *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001)). Only if circumstances "demonstrate that police coercion or overreaching overbore the accused's will and caused the confession" is an incriminating statement involuntary. *Conner v. McBride,* 375 F.3d 643, 651 (7th Cir. 2004).

Defendant argues that the agents' coercion began with their failure to identify themselves and the purpose of their visit. (R. 75, Def.'s Post-Hearing Br. at 15.) He also claims that the

11

agents coerced him because they misrepresented the intended length of the interview and interviewed him knowing that he was impaired by his medication. (*Id.*) The Court, aided by the factors listed above, comes to a different conclusion. Defendant is an adult and possesses a sufficient educational and intelligence level to run his own business. The interview was less than two hours in length. Defendant testified that Special Agent Dahlgren grew aggravated during the interview when Defendant contradicted him, but Defendant remained undeterred in clarifying his statements to the agents. In addition, Defendant alleges no use of physical punishment. As discussed above, Defendant was not admonished of his constitutional rights because he was not in custody. Using the multi-factor test laid out by the Seventh Circuit, the Court cannot find any evidence of coercion by the agents. The Court finds unpersuasive the Defendant's attempt to recast the agents' alleged failure to identify themselves to Defendant as coercion. Defendant's testimony contradicts that of the agents, who testified consistently and credibly that they identified themselves and showed him their badges. Even if the Court assumes that the agents failed to identify themselves, this omission does not rise to the level of coercion that "overbore the accused's will and caused the confession." *McBride*, 375 F.3d at 651. The Court finds that a reasonable person, under these circumstances, would not feel coerced to confess.

Defendant argues, however, that his mental state was compromised by his pain medication. (*Id.* at 14.) When the interrogating officers had reason to know a suspect was under the influence of drugs or alcohol, "a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." *Carson*, 582 F.3d at 833-34 (quoting *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir. 1991)). But a diminished mental state due to the effects of alcohol or drugs "is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *United States v. Chrismon*, 965 F.2d 1465, 1469

(7th Cir. 1992). *See also United States v.* Jones, 600 F.3d 847, 855 (7th Cir. 2010) (defendant's statement allegedly made under the influence of alcohol were admissible because he failed to link his intoxication to the voluntariness of his statement); *United States v. Montgomery*, 14 F.3d 1189, 1195 (7th Cir. 1994), *superseded on other grounds by* U.S.S.G, § 2D1.1 ("Even if we were to assume that [defendant] was a cocaine addict who may have been incapacitated, we would not necessarily conclude that the statement was involuntary because there still must be some showing of official coercion.").

Here, the agents acknowledge that they were aware that Defendant was recovering from surgery and on pain medication at the time of the interview, and thus a "lesser quantum" of coercion is appropriate in this case. The Court, however, is not inclined to place great weight on Defendant's testimony regarding his use of medication and his mental state. First, Defendant's declaration contains several inaccuracies, including the strength of the medication he took on the day of the interview and his subsequent chest wound rupture. (R. 45-1, Def.'s Decl.) Second, Defendant testified that the interview is a blur, but he knows that much of what is contained in the report is incorrect. This does not inspire confidence in Defendant's credibility. In contrast, both agents gave consistent and credible testimony that Defendant seemed lucid and understood the purpose of the interview and the questions asked of him. The Court notes, however, that the agents acknowledged that Defendant rambled on at certain points about matters outside the scope of the agents' questions, that his statement included an inconsistency about the amount of money he owed the Internal Revenue Service, and that he had trouble recalling the names of certain employees. While these occurrences could be the result of Defendant's diminished mental capacity, as Defendant contends, they could also be the result of nervousness, as the agents suspected. Although the Court has doubts as to Defendant's alleged diminished mental capacity,

even if it assumed Defendant was functioning with limited capacity, the Court finds no evidence of coercion that would be sufficient to render Defendant's statement involuntary. Defendant has the burden to prove that his alleged diminished mental capacity made coercive tactics by the agents more effective, see Madison, 689 F.2d at 1308, and having found no evidence of coercion, the record simply does not support such a finding. As a result, the Court finds that Defendant's statement was voluntary and his Fifth Amendment rights were not violated.

Although Defendant has not proven any constitutional violation was committed by the agents, the Court is troubled by the agents' investigative tactics. Special Agent Colin testified that she was aware that Defendant was represented by Sam Adam, Jr. Even if Defendant stated during the interview that Adam was not representing Defendant "at that time," Special Agent Colin read the correspondence sent by Adam to the CTA declaring that he was representing Defendant in any investigation pertaining to Thomas Painting and Decorating. The agents took advantage of Defendant's lack of legal prowess in order to run an end-run around his Fifth Amendment rights. While Defendant's assertions regarding his mental state are not compelling enough to invalidate the voluntariness of his confession, the Court notes that this entire dilemma could have been avoided if the agents had simply contacted Defendant's attorney prior to conducting the interview. Unfortunately, the Court cannot locate, and Defendant has not provided, any case law to suggest that the agents' tactics warrant a suppression of his statement. Indeed, a government agent's deceitful conduct does not render a confession inadmissible absent threats or promises by the agent. United States v. Kotney, 238 F.3d 815, 817 (7th Cir. 2001) (citing Frazier v. Cupp, 394 U.S. 731, 739 (1969)). The Court recognizes that government agents must zealously pursue alleged criminal wrongdoing. Nonetheless, the Court warns HUD

and DOL that, in this instance, their agents operated at the outer bounds of permissible conduct under the Fifth Amendment.

### III. Whether use of Defendant's statement would constitute a violation of Rule 4.2 of the Illinois Rules of Professional Conduct.

Defendant argues that the agents violated Illinois Rule of Professional Conduct 4.2 by interviewing Defendant in the absence of his attorney. (R. 45, Def.'s Reply at 4.) The Government argues that Defendant was not represented in the HUD investigation, and therefore, Rule 4.2 is inapplicable in this case. (R. 44, Gov't's Resp. at 11.)

Rule 4.2 provides that "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer . . . ." Ill. R. Professional Conduct 4.2. As an initial matter, the Court must first determine whether Rule 4.2 applies to this motion. Rule 4.2 applies to prosecutors prior to the filing of formal charges. *People v. Santiago*, 925 N.E.2d 1122, 1128 (Ill. 2010). The agents in this case are not attorneys, however, and Rule 4.2 is silent as to whether it extends to law enforcement agents. Defendant argues that under Illinois law, the agents are deemed "alter egos" of the CHA attorneys who initiated the initial investigation into Defendant. (R. 75, Def.'s Post-Hearing Br. at 14.) The Court finds this argument tenuous at best, as every CHA, HUD, and DOL employee that testified stated that the investigations of CHA and HUD were separate and that the CHA closed its investigation after it provided HUD with its findings. Defendant has offered no evidence that the CHA and HUD conducted a joint investigation. The Court notes, however, that the Government submitted an e-mail as evidence at the suppression hearing demonstrating that the interview took place at the behest of an Assistant United States Attorney involved in the investigation. From this, an inference could be made that the agents were alter egos of the Assistant United States Attorney.

15

Under Illinois law, government investigators can serve as the alter ego of a prosecutor "when they act at the behest of and with specific instructions from that prosecutor to elicit incriminating statements from the defendant." *People v. White*, 567 N.E.2d 1368, 1386 (Ill. App. Ct. 5th Dist. 1991). The *White* court instructed that "[m]erely instructing an [investigator] to induce the defendant to talk" does not rise to the level of an alter ego relationship. *Id.* "However, where the prosecutor instructs the [investigator] how to elicit incriminating statements by telling him what to say or ask, the [investigator] may be considered the alter ego of the prosecutor." *Id.* The rule "protects the criminal suspect from the superior legal skill of the prosecutor while allowing government investigators to employ legitimate investigative techniques to solve crimes and develop evidence necessary for a successful prosecution." *Id.* at 1387 (discussing Rule 7-104(a)(1) of the Illinois Code of Professional Responsibility, the predecessor to Rule 4.2).

In the instant case, Defendant does not argue, and no evidence suggests, that the prosecutor instructed the agents how to elicit incriminating statements or directed the manner in which the agents questioned Defendant. The evidence demonstrates that the agents interviewed Defendant with the end goal of "develop[ing] evidence necessary for a successful prosecution." *See id.* Defendant has the burden to introduce evidence that persuades the Court that his statement should be suppressed, and Defendant has not met his burden to prove that Rule 4.2 was violated when the agents interviewed Defendant in the absence of his attorney. Therefore, the Court cannot conclude that the Assistant United States Attorney or agents involved in this case violated Rule 4.2. Accordingly, the Court finds that Defendant's statement cannot be suppressed based upon a violation of Rule 4.2.

## CONCLUSION

For the reasons set forth above, Defendant's motion to suppress his statement (R. 43) is DENIED.

ENTERED: _____
Chief Judge Ruben Castillo
United States District Court

Dated: May 13, 2014